O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.   EDCV 08-00182 SGL (JCRx)                                                  Date:  August 11, 2008

Title:   DEBORAH VIERA & ROSE MARIE PEREZ -v- JAY CHEHAIBER, CHEHAIBER & SONS CORPORATION, EASTLAND ESCROWS, INC., NATIONAL CITY MORTGAGE CO., AND DOES 1-10
=======================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

|  |  |
|---|---|
| Jim Holmes | None Present |
| Courtroom Deputy Clerk | Court Reporter |

ATTORNEYS PRESENT FOR PLAINTIFFS:              ATTORNEYS PRESENT FOR DEFENDANTS:

None present                                                            None present

PROCEEDINGS:   ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT NATIONAL CITY MORTGAGE CO'S MOTION TO DISMISS

   Presently before the Court is defendant National City Mortgage Co.'s motion to dismiss, plaintiffs' opposition, and defendant's reply thereto.  For the reasons set forth below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

A. FACTUAL BACKGROUND

   Deborah Viera lived at a home located on 12406 Chestnut Place, Chino, California, 91710. By September, 2006, Viera had fallen behind in her payments on the mortgage to her home.  Viera was referred to defendant Jay Chehaiber to "refinance" her mortgage to alleviate her financial problems.  Chehaiber convinced Viera to "refinance" the mortgage on the house through a sham sale of the home to Viera's mother, Rose Marie Perez.  As described in the complaint, "[a]lthough on paper the transaction would appear to be a sale, not a refinance, it was a sham sale. [Viera] would continue to make the payments on the mortgage, and would continue to live in [home] along with her husband [and h]er mother, Rose, did not intend to take possession of the property." (Compl. ¶ 14).  In essence, the sale/refinance would swap out Viera's bad credit for the better creditworthiness of her mother, resulting in a loan for the "sale" that was on better terms than that currently extended on the property, all with the understanding that Viera would remain in

possession of the property and be the one responsible for making payments on the loan.

On October 24, 2006, Viera and her mother signed the loan documents for the sham sale of the home from Viera to her mother. The existing mortgage was paid off at $409,018.90 and the "sales price" for the home was $540,000. To finance the "sale," the lender, National City Mortgage Co., extended two loans, a first mortgage for $432,000 (not that much different the amount of the existing mortgage on the property) and a second mortgage for $108,000. The loans were secured with a Deed of Trust in favor of the lender National City Mortgage Co., which was then recorded in the San Bernardino County registrar's office. It is what happened during the loan closing that forms the gravamen of Viera and Perez's complaint in this case.

It is alleged that during the loan closing, Chehaiber "slipped a $126,500 unsecured promissory note from [Viera] to Amity Enterprise Inc. into the loan documents," and got Viera to sign the unsecured promissory note at the loan closing. The Amity Enterprise in whose favor the promissory note was made out is not a corporation but a d/b/a registered by Chehaiber. It is alleged that, after closing, Chehaiber used the promissory note in question to make a demand on the escrow company for payment in the amount of $117,250, "the difference between the payoff on the previous mortgage and the total of the new loans that [Perez] received." The escrow company, defendant Eastland Escrow, Inc., then paid Chehaiber the amount demanded on the unsecured note and Chehaiber in return signed documents submitted to the escrow company on behalf of Amity Enterprises, Inc.

Viera and Perez allege that they were not given copies of the loan documents at any time and that they did not receive copies of a rescission notice or a truth in lending statement. Indeed, the loan documents state Viera's address as a P.O. box that is registered in the name of and used by Amity Enterprises, Inc., thereby preventing Viera from receiving any documents to reveal the fraud, namely, the unsecured promissory note she signed in favor of Chehaiber's d/b/a.

The way that Viera found out about the alleged fraud was that, after the loan closing, she began to work for Chehaiber and, while working at his office, she discovered her loan paperwork and from that the truth of what Chehaiber had done. When confronted about the unsecured promissory note, Chehaiber promised Viera that he would make the mortgage payments on the note, but later failed to do so. When the truth was revealed to Perez, she became extremely upset and suffered a stroke twenty minutes later. She has remained hospitalized on account of her stroke ever since. The home was later foreclosed upon.

On February 8, 2008, plaintiffs filed a complaint alleging various claims against Chehaiber, his brokerage company Chehaiber & Sons Corporation, the escrow company Eastland Escrows, and the lender National City Mortgage Company. Specifically, the complaint alleges violations of the Truth In Lending Act ("TILA") and Homeownership Equity Protection Act ("HOEPA") for charging interest and points above that allowed, failing to provide certain required disclosures and seeks rescission, a declaration that any security interest obtained on the subject property through the transaction is void, and a return of any money plaintiffs gave to anyone in connection with the transaction. The complaint also asserts a violation of Real Estate Settlement Procedures Act ("RESPA") for the escrow agents payment to Chehaiber on the unsecured promissory note, which payment it is alleged was prohibited as an unearned fee because Chehaiber is not a licensed

mortgage broker.  Finally, the complaint alleges negligence for breaching an unstated duty each defendant had to plaintiffs by providing loan documents that facilitated a fraud and thereby funding a loan to pay a portion thereof (i.e., the unsecured promissory note) to Chehaiber.  This same allegation — facilitating Chehaiber's receipt of loan proceeds on the unsecured note through submission of loan documents — also underlies plaintiffs claim that defendants defrauded them.

     Defendant National City (and only defendant National City) has now come forward with a motion to dismiss the claims brought against it.  The Court will proceed by analyzing first the arguments directed to the federal claims brought against National City and then the state law claims.

A.     <u>TILA and HOEPA claims</u>

     Defendant argues that plaintiffs' claim that the HOEPA disclosure provisions were violated is defective because those disclosure mandates do not apply to sales of homes between individuals; instead, they only apply to a "credit transaction that is secured by consumer's principal dwelling." How defendant arrives at this conclusion is through an iteration of statutes and regulations, beginning with the HOEPA disclosure statute which provides in relevant part that "[i]n addition to the other disclosures required under this subchapter, for each mortgage <u>referred in section 1602(aa)</u>" the lender has to provide a laundry list of disclosures.  Section 1602(aa), in turn, provides that "a mortgage referred to in this subsection means a consumer credit transaction that is secured by consumer's principal dwelling <u>other than a residential mortgage transaction</u> . . . ."  In other words the HOEPA disclosure requirements do not apply to a "residential mortgage transaction."  That, of course, begs the question as to the meaning of that term.  Toward that end, section 1602(w) defines "residential mortgage transaction" as "a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the <u>acquisition</u> or initial construction of such dwelling."

     Defendant argues that, since plaintiff Perez acquired legal title to the property (via a deed of trust) from plaintiff Viera through the transaction, it was a "residential mortgage transaction" and, hence, the HOEPA disclosure requirements do not cover the transaction, thereby precluding plaintiffs claim on that point.

     Plaintiffs respond that, to label the transaction a "residential mortgage transaction," the Court would have to make certain conclusions for which there is no support in the complaint. Specifically, plaintiffs argue whether something is a "refinance" or a "purchase" depends upon looking at the "substance of the transaction and the intent of the parties' . . ., not the form" in which the transaction took.  <u>In re Ellis</u>, 674 F.2d 1238, 1247 (9th Cir. 1982).  Here, plaintiffs argue that, while the form of the transaction was a technical "sale" of the property from Viera to her mother, the intent of the parties was for Viera to remain in possession of the property and be the one responsible for paying off the "purchase" loan; in effect, a refinance of Viera's existing mortgage covering the property and not a true "sale" of the property.  As stated by plaintiffs: "The purchase here was nothing more than a legal fiction."  (Opp. at 3).

     To this National City responds that it is the intent of both parties to the transaction that is

controlling, not just the intent vis-a-vis Viera and Perez. It argues that there has been no specific factual allegation offered indicating that National City intended or was informed beforehand of the plaintiffs' secret intent behind the purchase. Absent some indication evincing National City's shared intent in engaging in a sham sale for the purpose of allowing Viera to re-finance her loan, defendant argues that the HOEPA disclosure claim must be dismissed.

There is, however, a bare allegation in the complaint as follows: "Defendants were aware of these facts, structured the sham sale, and instructed Plaintiffs on what to do in order to accomplish the refinance through this sham sale." (Compl. ¶ 15). When pressed during oral argument as to the factual basis for this allegation, plaintiff's counsel admitted that it was based on "speculation." That being said, there is an allegation in the complaint that all of the defendants, including National City, were aware of the true intent behind the "sale" and, therefore, the Court does not believe that dismissal at this stage is warranted.[1] Rather, whether plaintiffs have a viable HOEPA claim against National City will turn on discovery proving or disproving this allegation in the complaint about common knowledge amongst all the defendants.

Similarly, National City's attack on plaintiffs' assertion that it violated a provision of HOEPA prohibiting the extension of credit to "consumers . . . based on the consumers' collateral without regard to the consumers' repayment ability" is contingent on whether or not the transaction in question was a "residential mortgage transaction" to which the prohibition does not apply. See 15 U.S.C.
§ 1639(h). For the reasons stated above, it is not appropriate at this stage to reach a conclusion on whether the transaction in question was a residential mortgage transaction given the factual allegation in the complaint that National City "was aware" of the sham nature of the "sale." Accordingly, defendant's motion to dismiss the HOEPA claim is **DENIED**.

Finally, National City argues that plaintiffs' TILA claim for damages is time-barred. A claim for the damages under the TILA must be brought within a year from the date of the violation. See 15 U.S.C. § 1640(e) ("Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation"). National City argues that, generally speaking, a TILA violation occurs from the date the transaction is consummated because that is when any required disclosures mandated by TILA must be given. See Hubbard v. Fidelity Federal Bank, 824 F. Supp. 909, 919 (C.D. Cal. 1993); Katz v. Bank of California, 640 F.2d 1024 (9th Cir. 1981). National City then notes that the sale/refinance was consummated on October 24, 2006, when the loan documents were signed, but that plaintiffs waited until February 8, 2008 – over 15 months later – to file suit. Given the length in the passage of time, National City argues plaintiffs' claim for damages under TILA is barred.

Plaintiff argues that the limitations period should be equitably tolled due to defendants'

---

[1] If it turns out during the discovery process that this admittedly "speculative" factual allegation is not borne out in discovery, Rule 11 sanctions may be in order. The Court advised plaintiffs' counsel during oral argument whether he wished to proceed with this claim despite its speculative nature, and he indicated that he wished to do so.

conduct in hiding or otherwise making it hard for them to discover there was any TILA violation. National City's first response to the claim for equitable tolling is that "the one-year limitation period for an action for damages under TILA runs from the date of the transaction regardless of when a consumer discovers the violation." (Reply at 5).  That statement is simply untrue.  Binding Ninth Circuit precedent does employ an equitable tolling mechanism for TILA damage claims, something even defense counsel admitted during oral argument.  See King v. State of California, 784 F.2d 910, 919 (9th Cir. 1986).  As the Ninth Circuit explained in King:

> Although the Act may impute to borrowers knowledge of their rights as consumers of credit, there may be situations in which a borrower consummates his loan and passes a year without knowing of his lender's fraud or nondisclosures.
>
> We agree with the Sixth Circuit that equitable tolling might be appropriate in certain circumstances. To decide whether equitable tolling should apply to Section 1640(e), our basic inquiry is whether tolling the statute in certain situations will effectuate the congressional purpose of the Truth-in-Lending Act. The Supreme Court has repeatedly applied equitable tolling to statutes of limitations to prevent unjust results or to maintain the integrity of a statute.
>
> Section 1601 of TILA sets forth the purpose of the Act:
>
>> (a) The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit....
>
> 15 U.S.C. § 1601(a). Thus, Congress through TILA sought to protect consumers' choice through full disclosure and to guard against the divergent and at times fraudulent practices stemming from uninformed use of credit. The courts have construed TILA as a remedial statute, interpreting it liberally for the consumer. As the Sixth Circuit noted, "[o]nly if Congress clearly manifests its intent to limit the federal court's jurisdiction will it be precluded from addressing allegations of fraudulent concealment which by their very nature, if true, serve to make compliance with the limitation period imposed by Congress an

>
> impossibility."
>
> For these reasons, we hold that the limitations period in Section 1640(e) runs from the date of consummation of the transaction but that the doctrine of equitable tolling may, in the appropriate circumstances, suspend the limitations period until the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that form the basis of the TILA action. Therefore, as a general rule the limitations period starts at the consummation of the transaction. The district courts, however, can evaluate specific claims of fraudulent concealment and equitable tolling to determine if the general rule would be unjust or frustrate the purpose of the Act and adjust the limitations period accordingly.

Id. at 914-15.  Thus, to say as National City does that the limitations period runs from the date of the transaction "regardless of when a consumer discovers the violation" is mistaken.  The statement is generally true, but the Ninth Circuit has carved out an exception for instances in which the consumer's ability to learn of the violation was hidden.  This is what plaintiffs alleged occurred here:  Chehaiber misdirected all the loan documents that would have been sent to Viera to a P.O. Box in the name and under the control of Chehaiber.  Of course, the problem with this theory is that plaintiffs' TILA claim is that they never received the TILA statement, not that the one they received was erroneous or contained anomalies.  The lack of a TILA statement, however, would have been apparent from the day the loan was consummated and plaintiffs were never given any loan documents.  Moreover, the fraud in question – the use of Chehaiber's P.O. Box — was only used by the complaint's own admission to misdirect where the loan documents would be sent for Viera.  There is absolutely no allegation in the complaint that the same was true of the address used for Perez, Viera's mother.

Given that the fraud to which plaintiffs' equitable tolling claim is directed does not touch upon the specific TILA claim at issue, the Court holds that the TILA damages claim is time-barred and therefore is **DISMISSED**.

B.   RESPA claim

As to the remaining federal claim — that the escrow payment on the unsecured promissory note to Chehaiber was an unearned fee because he is not a registered broker — National City argues that it cannot be held liable for this wrong because it was not the one who received the allegedly "unearned fee" (Chehaiber) nor was it the one who paid the "unearned fee" (Eastland Escrows).  According to National City, it cannot be held liable absent some showing of a relationship between itself and the escrow company such that any payment by the latter can be attributed to the former.  The only thing plaintiffs come forward with in response is the contention that National City and the escrow company had a relationship whereby the one would pay the other for referrals of its product, thereby creating an agency or employment relationship sufficient to impute the acts of one (the escrow company) to the other (the lender, National City).  As explained in their opposition: "On a motion to dismiss, the court must assume that the plaintiffs allegations are true and must draw all reasonable inferences in the plaintiffs favor.  Here, that

National City paid Chehaiber is a reasonable inference that should be made in Plaintiffs' favor, as escrow was merely acting as an intermediary between National City and Chehaiber." (Opp. at 4). What allegation in the complaint is this inference to be based on? The following one: "At all times herein mentioned each Defendant was the agent or employee of each and all of the other Defendants and was acting within the course and scope of such agency or employment." (Compl. ¶ 12). This rather conclusory allegation, completely devoid of any factual allegation to support it but long on legal conclusions flowing from it — that each defendant was an agent (a legal finding) to the other — seems to stretch the complaint too far to continue to hold National City on the hook for something that the complaint otherwise demonstrates was a transaction between two other separate defendants. That said, whether there was a agency relationship (as concluded by the allegation in the complaint) is a factually driven question and one best left at this stage in the proceedings to be accepted and left for summary judgment.

Defendant also argues that any agency relationship created in the escrow context is that between the escrow agent and the parties to the escrow of which National City was not a part. This argument, however, assumes the resolution of certain factual questions, none of which have been (or could be) resolved at this point.

Accordingly, the motion to dismiss plaintiffs' RESPA claim is **DENIED**.

C.   <u>State Law Claims</u>

Finally, National City argues that a negligence claim cannot be brought against it because a lender generally does not have or owe a duty of care to a borrower when the lender's involvement in the loan transaction does not exceed the scope of its conventional role as merely a lender of money. Unless there has been an allegation that the lender actively participated in the financed enterprise, it is argued no liability for negligence can attach. Plaintiffs argue that National City did not exercise sufficient control or care over the money in question (<u>i.e.</u>, that related to the unsecured promissory note) to make sure it got to them instead of being directed to Chehaiber. The problem is that, on the two loans in question, National City did in fact ensure that the money did get to where it was supposed to go – the money covered by the note was tendered precisely to the entity named in the note to whom it could be delivered, Chehaiber. That is to say, the only money in question that did not get to plaintiffs was on the unsecured promissory note in the secret transaction between Chehaiber and Eastland, money over which National City contends it never had control over. Resolution of this issue, like that related to the HOEPA and RESPA claims, turns on whether National City was aware of the nature of the entire transaction (including the unsecured note) and whether there was an agency/employee relationship between National City and the escrow company. As noted previously, there are allegations in the complaint (not much more than bare bones allegations for sure) that make out that such foreknowledge and relationship existed. Unless and until those allegations are proven or disproved during discovery, dismissal at this stage in the litigation is inappropriate. Accordingly, the Court **DENIES** defendant's motion to dismiss the negligence claim.

The same cannot be said of plaintiffs' fraud claim against National City. That claim is predicated, like the negligence claim covered above, on the bare bones allegation that

"defendants" were aware of and participated in the transaction to defraud plaintiffs. (Compl. ¶ 40 (alleging that defendants "knew and defrauded plaintiffs by concealing the true terms of the mortgages and the existence of the promissory note from plaintiffs, or, in the alternative, through negligent and willful blindness, failed to discover and reveal Defendant Chehaiber's fraud")). Such broad strokes do not suffice for purposes of the heightened pleading standards for alleging fraud claims under Federal Rules of Civil Procedure 9(b). Plaintiffs must fill in the precise manner in which National City concealed the nature of the fraud transaction it "knew" about, or specify how it willfully failed to discover Chehaiber's fraud. As National City correctly argues, "there are no allegations as to how National City supposedly knew of Chehaiber's plan to defraud them," no recital of any conversations, statements, or documents passed between and among the other defendants to this fraudulent conspiracy. For these reasons, the Court hereby **DISMISSES** plaintiffs' fraud claim, but with leave to amend their complaint within 14 days of the date this Order is entered to cure these deficiencies with its fraud claim.

**IT IS SO ORDERED.**